## RICHARDSON NATIONAL BANK

v.

## RELIANCE INSURANCE COMPANY.

### Civ. A. No. CA–3–76–0919–G.

United States District Court,
N. D. Texas,
Dallas Division.

Dec. 14, 1977.

James A. Knox, Vial, Hamilton, Koch, Tubb, Knox & Stradley, Dallas, Tex., Raymond D. Noah, Noah, Mason & McBeth, Inc., Richardson, Tex., for plaintiff.

Alan Wilson, Charles J. McGuire, W. Ted Minick, Winstead, McGuire, Sechrest & Trimble, Dallas, Tex., for defendant.

### MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

PATRICK E. HIGGINBOTHAM, District Judge.

This is a suit by a bank against its insurer under a standard banker's blanket bond. The material facts are not in dispute and the legal issues are drawn by cross motions for summary judgment.

### FACTS

Richardson National Bank "bank" made three (3) loans to Stonecipher in an aggregate sum of $15,968.54. That sum was not repaid and is now the amount of the claimed loss. Stonecipher delivered to bank as collateral four (4) Manufacturer's Statements of Origin (MSO's). Under Texas law an MSO evidences ownership of vehicles in transfers from a manufacturer to dealer and among dealers. Upon sale to a consumer, application to the state for a certificate of title must be made. That application must be accompanied by an MSO endorsed to the consumer by the dealer.

The four MSO's here recited that General Motors Division had transferred title to Late Chevrolet, a Dallas dealer and employer of Stonecipher. Three of the MSO's recited a transfer of ownership from Late to Stonecipher and the fourth a transfer to Stonecipher's wife. The transfer from Late to Stonecipher was purportedly accomplished by Tom Rice, business manager of Late and attested by Judy Hedrick, a Notary Public. Stonecipher also gave to the bank four signed but otherwise incomplete applications for certificates of title.

The signatures of Tom Rice and the notary were fake. Each MSO bore on its face a genuine or forged facsimile signature of a General Motors official. Descriptions of nonexistent vehicles or motor numbers of vehicles of other vehicles were added without any authority of General Motors or Late Chevrolet.

### THE ISSUES

As a general proposition, loan losses are not insured. An exception are loan losses covered by insuring clause (E). It provides:

"(E) Loss (1) through the Insured's having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been

(a) counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guaran-

tor or as to the signature of any person signing in any other capacity, or

(b) raised or otherwise altered or lost or stolen   .   .   .

"Securities, documents or other written instruments shall be deemed to mean

(a) original (including original counterparts) negotiable or non-negotiable agreements in writing, other than as set forth in (b) and (c) below, having value which value is, in the ordinary course of business, transferable by delivery of such agreements with any necessary endorsement or assignment   .   .   .

"The word 'counterfeited' as used in this Insuring Agreement shall be deemed to mean only an imitation of a security, document or other written instrument, as set forth in (a) above, which is intended to deceive and to be taken for an original. "Mechanically reproduced facsimile signatures are treated the same as handwritten signatures."

The first question is whether the MSO's are "securities, documents or other written instruments". *Union Investment Company v. Fidelity & Deposit Company of Maryland*, 400 F.Supp. 860 (E.D.Mich.1975) listed five elements essential to classification as a "security document or other written instrument":

1. an original (or counterpart) and in writing;
2. an agreement;
3. negotiable or non-negotiable;
4. must have "value";  and
5. said value must be transferable in the ordinary course of business by delivery with any necessary endorsement or assignment.

■   Only value is here at issue.  Defendant urges that the MSO's had no value because they gave nothing to the bank of value, including, for example, any liens. While the bank halfheartedly urges that a lien was created because Stonecipher's borrowings were in fact inventory financing its main thrust is that the MSO's were instruments of value in its hands—regardless of the bank's vulnerability to claims of others.

Defendant's view of value is overdrawn and if fully accepted, illogical.  An insured has no occasion to present a claim except where a loss has occurred.  It is when instruments are not all they purported to be that the question of value often arises.  If a concocted instrument would have transferred value if genuine, the element of value is present. The instruments here meet the requirement of value.

■   The next (and controlling) issues are the applicability of the coverage provided by paragraphs (a) and (b) of clause E.

a) 1.   counterfeited:  the bond provides: "The word 'counterfeited' as used in this Insuring Agreement shall be deemed to mean only an imitation of a security, document or other written instrument, as set forth in (a) above, which is intended to deceive and to be taken for an original."

There were no original instruments and accordingly the MSO's did not imitate but created.  They are not counterfeit under the bond.  See *Bank of the Southwest v. National Surety Co.*, 477 F.2d 73 (5th Cir. 1973);  *Capital Bank of Chicago v. Fidelity & Casualty Co. of New York*, 414 F.2d 986 (7th Cir. 1969);  *State Bank of Poplar Bluff v. Maryland Casualty Co.*, 289 F.2d 544 (8th Cir. 1961).

■   2.   *forged as to signature.*

Defendant argues that if the bank had used the instruments delivered by Stonecipher to it, certificates of title would have issued upon nonexistent vehicles;  that in that posture this case is factually indistinguishable from *Bank of the Southwest v. National Surety*, supra.  *Bank of the Southwest* is not factually apposite because the security documents presented to that bank did not contain any forged signature.  The defendant's argument, although not so labeled, is essentially that the "forged signatures" of the Late official and the signatures of the attesting notary are not, as a matter of law, loss causing events because if the signatures were genuine the bank would still not have had a security interest in automobiles. There is language in the bond to support

defendant's position that the bond requires a causal nexus between a forgery and an insured loss. The bond's loan exclusion denies coverage in cases of false representations as distinguished from losses flowing from presentation of certain security documents. Maintenance of that distinction requires that the loss flow from the circumstance that the security document did not (because of the forgery) contain its intrinsic worth. The faked signatures were indisputedly forgeries in the sense they falsely purported to be the signatures of another and it is equally indisputable that the bank " . . . extended credit . . ." upon them. The defendant replies that even if the signatures were valid, the MSO's would not have given the bank any lien rights. This is not a reply to the assertion that the instruments are forged as to signature but appears to be a reassertion of defendant's argument of "no value." Regardless, the forgery deprived the bank of a right of action against Late. If Late was then able to financially respond, the forgery may have indeed caused the loss. At least there is a fact question on this point.

b) "raised or otherwise altered . . . . " The weakness in the bank's reliance upon an unauthorized alteration (the "completion" of the MSO with fictitious descriptions of automobiles) is that one cannot, in the sense of the bond, alter or otherwise raise, a nongenuine instrument. These MSO's were never in fact what they purported to be when completed. Alteration presupposes something to alter and these MSO's were virtually cut from whole cloth. *Bank of the Southwest v. National Surety Corp.*, 477 F.2d 73 (5th Cir. 1973).

 Defendant urges that whether the bank in good faith relied upon the MSO's in its extension of credit presents a fact issue sufficient to avoid summary judgment. There is no evidence of bad faith. At best one might infer negligence in the bank's policing of its collateral, but this inference, weak itself, falls short of bad faith.

Bond coverage requires that the bank have " . . . extended any credit . . on the faith of . . . or otherwise acted upon . . ." the MSO's.

Evidence to suggest that the bank did not rely upon these MSO's is meager. While it is clear now that the bank should not have extended the credit, it is undisputed that these MSO's were held as collateral for the bank loans. Arguably taking the MSO's as collateral is at the least within the broad language of "otherwise acted upon." And it is a weak, at best, answer to argue that whether the bank " . . . otherwise acted upon . . ." is an "inherent" fact question. But because there is a fact question with regard to the financial ability of Late to have responded to the claimed breach of covenant, it is the better course to also "try" this question.

The motions for Summary Judgment will be denied.