**RELIANCE INSURANCE COMPANY, Plaintiff,**

v.

**CAPITAL BANCSHARES, INC./CAPITAL BANK and Sunbelt Bancorp, Defendants,**

v.

**INTERNATIONAL INSURANCE COMPANY, Additional Defendant on Counterclaim.**

**Civ. A. No. 3–86–1930–H.**

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 4, 1988.

James A. Knox, Stephen L. Baskind, Vial Hamilton Koch & Knox, Dallas, Tex., for plaintiff.

Wayne E. Lee, Bailey & Williams, W. Michael Byrd, Clarice M. Davis, Akin Gump Strauss Hauer & Feld, Dallas, Tex., for defendants.

MEMORANDUM OPINION
AND ORDER

SANDERS, Acting Chief Judge.

This case is before the Court on the parties' cross-motions for summary judgment. Before the Court are Capital Bancshares, Inc./Capital Bank's ("Capital") Motion for Summary Judgment with supporting affidavits and exhibits, and brief in support thereof, filed September 17, 1987, the response of Reliance Insurance Compa-

ny ("Reliance") and International Insurance Company ("International"), filed October 13, 1987, and the reply of Capital, filed October 23, 1987. Also before the Court are Reliance and International's Motion for Summary Judgment, brief in support thereof, and accompanying summary judgment evidence, filed September 18, 1987, the response of Capital, filed October 13, 1987, the response of Sunbelt Bancorp ("Sunbelt"), filed October 15, 1987, and the reply of Reliance and International, filed October 23, 1987. Finally, before the Court is Sunbelt's Motion for Summary Judgment with supporting affidavit and exhibits, and brief in support thereof, filed January 22, 1988.

The issue before the Court is whether the losses suffered by Capital and Sunbelt are covered under the bonds issued by Reliance and International. The Court concludes that the losses are not covered by the bonds. Accordingly, Reliance and International's Motion for Summary Judgment is GRANTED, and the Motions of Capital and Sunbelt for Summary Judgment are DENIED.

## I. *Background*

The material facts in this case relevant to the coverage issue are undisputed. Reliance and International each issued to Capital a Bankers Blanket Bond ("Bank Bond"). Reliance also issued a Savings and Loan Blanket Bond ("S & L Bond") to Sunbelt. The bonds are standard form insurance contracts that provide indemnity to the insured banks thereunder for certain losses described in the Insuring Agreements of the Bonds. All of the bonds in this case included Insuring Agreement (E), and it is under that agreement that the banks claim indemnity in this case.[1]

During the time the bonds were effective both banks discovered that they had suffered losses, which they believed were covered by the bonds. Capital discovered that it had suffered a $1,280,000 loss as a result of two loans in that total amount made to Bob Coats ("Coats") and secured by stock certificates for 30,000 shares of common stock of American International Group, Inc. ("AIG") issued to Coats and delivered by him to Capital. Sunbelt discovered that it had suffered a $900,000 loss, also as a result of two loans made to Coats and secured solely by stock certificates for 30,000 shares of AIG stock issued to Coats and delivered by him to Sunbelt.

The losses arose when Coats defaulted on the loans and the banks discovered that the stock certificates were not genuine stock certificates issued by AIG. At the time of the loans, AIG was an existing corporate entity with common stock outstanding. Coats, however, never owned any AIG stock, and the certificates he pledged as collateral contained the forged signatures of the President and Secretary of AIG and the name and forged countersignature of the transfer agent and registrar of AIG stock.

In their motion for summary judgment, Reliance and International seek a declaratory judgment that the loan losses of Capital and Sunbelt are not within the scope of coverage of Insuring Agreement (E). Sunbelt and Capital seek via their motions for summary judgment a declaration that their loan losses are within the scope of coverage and partial summary judgment on their counterclaims for recovery of the insured loss.[2]

---

1. Insuring Agreement (E) insures against certain loan losses. It provides indemnity for, in pertinent part:

    (E) Loss resulting directly from the insured having in good faith, for its own account or for the account of others,
    (1) acquired, sold or delivered, or given value extended credit or assumed liability, on the faith of, or otherwise acted upon, any original
    (a) Security, ... which
    (i) bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor,

or of any person signing in any other capacity which is a Forgery, or
    (ii) is altered, or
    (iii) is lost or stolen....
    (3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any item listed in (a) above which is a Counterfeit.

2. Defendants do not seek summary judgment on their claims of misrepresentation, fraud, and bad faith. The Court's review of those claims indicates that they are dependent on a holding that Defendants' losses are covered under the

## II. *Summary Judgment*

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and the movant is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56. No genuine issue exists in this case as to any material fact relating to whether the losses suffered by Sunbelt and Capital are within the scope of coverage of Insuring Agreement (E). Summary judgment is therefore proper.

### A. *Counterfeit*

■ Reliance and International contend first, that the losses resulting from the loan transactions with Coats are not covered because the stock certificates pledged by Coats are not counterfeit within the meaning of Insuring Agreement (E). The term "counterfeit" is defined in the bonds as "an imitation which is intended to deceive and to be taken as an original." Despite this seemingly straightforward definition, the question of whether instruments accepted as collateral for loans are counterfeit and therefore within the coverage of Insuring Agreement (E) has been not infrequently litigated. The judicial gloss is determinative in this case.

The courts have consistently held that to be counterfeit under a Bankers or S & L Bond, the allegedly counterfeit instrument must be an imitation of an actual existing (or previously existing) original genuine document. *See e.g. Bank of the Southwest v. National Surety Co.,* 477 F.2d 73, 76 (5th Cir.1973); *Exchange National Bank of Olean v. Insurance Co. of North America,* 341 F.2d 673, 676 (2d Cir.), *cert. denied,* 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965); *Richardson National Bank v. Reliance Insurance Co.,* 491 F.Supp. 121, 123 (N.D.Tex.1977), *aff'd,* 619 F.2d 557 (5th Cir.1980). Reliance and International argue that Coats' bogus stock certificates are not counterfeit because they did not imitate a genuine existing document. This is so, they argue, because there was no genuine AIG stock certificate bearing Coats' name

to imitate since Coats had never owned any AIG stock. Thus the bogus certificates were not counterfeit, but rather fraudulently created from whole cloth.

Reliance and International's position finds support in the caselaw. In *Bank of the Southwest v. National Surety Co.,* 477 F.2d 73 (5th Cir.1973), the bank sought reimbursement under Insuring Agreement (E) for losses sustained on a loan that was secured by a car. The instrument surrendered on the faith of which the bank lent money was a Tax Collector's Receipt for Title Application ("white slip") No. V–460376. The facts were undisputed that a genuine white slip No. V–460376 existed, but had been issued to a person other than the borrower for a car other than the one described on the bogus slip, a 1970 Cadillac. The court held that "[t]hus, the 'white slip' held by [the bank] was not an imitation of an authentic original document and was not 'counterfeit' within the coverage of Insuring Agreement (E)." *Id.* at 77. Apparently, in order to have been considered a counterfeit the white slip in *Bank of the Southwest* would have to have been an imitation of a genuine white slip issued to the borrower for a car owned by him.

The facts in *Bank of the Southwest* are closely analogous to those in this case. There was in existence a genuine white slip in *Bank of the Southwest* just as there were in existence genuine AIG certificates in this case. In *Bank of the Southwest* the bogus white slip was purportedly issued to someone other than the person to whom the original was in fact issued and the bogus slip described a different car than was described by the original. Thus, the bogus slip was not a direct imitation and not counterfeit. Similarly, the bogus AIG stock certificates in this case were purportedly issued to someone other than the person to whom any genuine original was issued. Thus, following the holding of *Bank of the Southwest,* the bogus certificates in this case are not direct imitations and are not counterfeit.

bonds. Because the Court holds that Defendants' losses are not within the scope of the

bonds' coverage, Defendants' claims of misrepresentation, fraud, and bad faith are moot.

Capital argues strenuously that the case-law creates a distinction between types of misrepresentations, and that the distinction makes *Bank of the Southwest* inapplicable. One type of misrepresentation is that going to authenticity or genuineness of execution. Capital argues that this type of misrepresentation when present in an instrument creates a counterfeit. The second type of misrepresentation, which does not create a counterfeit, deals with facts other than the genuineness of execution, such as the existence of the underlying collateral. Capital thus argues that *Bank of the Southwest* is distinguishable from the case at bar because whereas in this case the stock certificates lacked genuineness in their execution and, therefore, should be held counterfeit, the loss in *Bank of the Southwest* was caused by misrepresentation of facts other than the genuineness of execution, the existence of the 1970 Cadillac.

There is dicta in some of the Insuring Agreement (E) counterfeit cases tending to support the distinction between types of misrepresentations urged by Capital. *See e.g., Whitney National Bank of New Orleans v. Transamerica Insurance Co.,* 476 F.2d 632, 634 (3d Cir.1973); *Maryland Casualty Co. v. State Bank & Trust Co.,* 425 F.2d 979, 983–84 (5th Cir.), *cert denied,* 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970); *Exchange National Bank of Olean v. Insurance Co. of North America,* 341 F.2d 673, 676 (2d Cir.), *cert. denied,* 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965). No court, however, has applied this distinction to hold a document counterfeit that did not precisely imitate an original genuine document. The distinction cannot survive in light of the Fifth Circuit's holding in *Bank of the Southwest.*

The clear emphasis of the court in *Bank of the Southwest* was on the existence of an authentic original document, which, in order to be considered counterfeit, the imitation must essentially duplicate.[3] Capital argues that such an absurdly narrow definition of the term "counterfeit" reads counterfeit coverage right out of the bonds. The Court agrees that the definition of counterfeit is narrow, but not absurdly so. Reliance and International note the exact case in which Insuring Agreement (E) would provide counterfeit coverage: If Coats had owned 30,000 shares of AIG stock, had made imitations of his genuine certificates, and had submitted those imitations to several banks as collateral, those imitations would have been counterfeit and the banks would have been able to recover their losses under Insuring Agreement (E). This scenario is not farfetched; it has in fact occurred and been litigated. *See American National Bank & Trust Co. v. Fidelity & Casualty Co.,* 431 F.2d 920 (5th Cir.1970). In the case at bar, the stock certificates were fraudulent, but were not counterfeit.

## B. *Forgery*

■ Reliance and International argue next that the banks' losses are not covered under the forgery provision of Insuring Agreement (E) because the losses did not directly result from the forgery. The Court agrees. The language of Insuring Agreement (E) makes it clear that in order for the insured to recover, the claimed loss must have resulted "directly from the insured having in good faith ... extended credit ... on the faith of ... any original [s]ecurity ... which bears a signature of any ... transfer agent [etc.] ... which is a Forgery." *See supra* note 1.

In this case the losses suffered by Capital and Sunbelt resulted directly from Coats' fraudulent scheme, but not from the forged signatures. Even if the signatures

---

**3.** This emphasis on the duplication of a genuine document was repeated in *Richardson National Bank v. Reliance Insurance Co.,* 491 F.Supp. 121, 123 (N.D.Tex.1977), *aff'd,* 619 F.2d 557 (5th Cir. 1980). In *Richardson* the bank took possession of bogus automobile title documents (MSO) to perfect its security interest in the collateral cars. Apparently, some of the cars described in the MSOs *did not exist* and others existed but were not owned by the borrower. *Id.* at 122. In deciding whether the documents were counterfeit, the court did not discuss the existence or lack thereof of the collateral, but instead emphasized the lack of existence of original genuine documents. The court stated: "There were no original instruments and accordingly the MSO's did not imitate but created. They are not counterfeit under the bond." *Id.* at 123.

had been genuine, the bogus stock certificates would not have been and the banks would still have suffered losses identical to those they now face. Thus, the losses are not the direct result of the banks having extended credit on the faith of securities that bore forged signatures. The losses suffered by Capital and Sunbelt are not covered by the forgery provision of Insuring Agreement (E).

Accordingly, Reliance and International's Motion for Summary Judgment is GRANTED and Capital's and Sunbelt's Motions are DENIED. Plaintiff will submit a judgment by noon, *February 11, 1988.*

SO ORDERED.